**Grady PARTON, Plaintiff-Appellee,**

v.

**MARK PIRTLE OLDSMOBILE–CADILLAC–ISUZU, INC., Defendant-Appellant.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 6, 1987.

Application for Permission to Appeal Denied by Supreme Court May 4, 1987.

Frank M. Fly, Murfreesboro, for plaintiff-appellee.

B. Timothy Pirtle, McMinnville, for defendant-appellant.

## OPINION

CANTRELL, Judge.

This dispute involves the efficacy of an exculpatory provision in a preprinted automobile repair order signed by the owner of the automobile.

In October of 1984 Mr. Parton, an automobile wholesaler, took a Cadillac automobile to the defendant for repairs. He signed a preprinted form containing a work order which authorized the defendant to perform the repairs specified thereon. The form used by the defendant contained the following provision in small print in the upper left corner:

"I hereby authorize the repair work hereinafter set forth to be done along with the necessary material and agree that you are not responsible for loss or damage to the vehicle or articles left in vehicle in case of fire, theft, or any other cause beyond your control ..."

Mr. Parton left the automobile in the possession of the defendant. The defendant's employees placed the automobile on an unfenced and unattended rear lot from which it was stolen. The Tennessee Bureau of Criminal Identification subsequently recovered the car in a damaged condition. Mr. Parton sued the defendant for the damages and after a bench trial in the Circuit Court of Rutherford County, the trial judge ruled that the language contained in the work order did not release the defendant from its negligence. Mr. Parton, therefore, recovered a judgment for his damages.

We note that the order signed by Mr. Parton, which is the foundation of the appellant's defense, is not in the record. In their briefs, the parties have referred to the language contained in a similar preprinted document which is apparently identical to the one in question. We will refer to that document also for the location and size of the type used in the exculpatory provision. A copy of the work order is attached as an appendix to this opinion.

The only issue raised by the appellant is:

"The trial court erred in denying the validity of an exculpatory clause in the contract between the parties executed by Mr. Parton releasing the dealership from any liability for damage to the motor vehicle caused by theft."

The appellant argues that Tennessee recognizes the validity of exculpatory provisions, or that one party may agree that another party will not be liable for future acts of negligence. As a statement of a legal principle, the appellant's contention is correct. In *Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn.1973), our Supreme Court said:

It is well settled in this State that parties may contract that one shall not be liable for his negligence to another but that such other shall assume the risk incident to such negligence. Said rule was stated and applied in *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960), where the agreement signed by plaintiff read, "I am hiring your horse to ride today and all future rides at my own risk."

Further, it is not necessary that the word "negligence" appear in the exculpatory clause and the public policy of Tennessee favors freedom to contract against liability for negligence.

■ There are some exceptions to the rule announced in *Empress* which we do not deem to be material. A common carrier may not by contract exempt itself from liability for breach of a duty imposed on it for the benefit of the public, *Dodge v. Nashville C. & St. L. Ry.*, 142 Tenn. 20, 215 S.W. 274 (1919), and a railroad's liability for willful or gross negligence in running over a slave asleep on the track cannot be contracted away. *Memphis and Charleston Railroad Company v. Jones,*

39 Tenn. (2 Head) 517 (1858). In addition, our Supreme Court has recognized an exception where the party seeking the protection of the exculpatory provision is a professional person rendering a service of great importance to the public. *Olson v. Molzen*, 558 S.W.2d 429 (Tenn.1977) (a physician who sought to escape liability for negligence in the performance of an abortion.) The Supreme Court said, "We do not approve the procurement of a license to commit negligence in professional practice." While it is arguable that the principle announced in *Olson v. Molzen* could be applied to the case at bar, we do not think the Supreme Court intended the rule to be applied to transactions by what the Court termed "tradesmen in the market place." Therefore, we do not apply the rule announced in *Olson v. Molzen* to this case.

The appellee contends, however, that the language used in the form does not purport to excuse the appellant's negligence. This argument is based on the assertion that the phrase "beyond your control" refers also to "fire" and "theft". Thus, the language used in the form excuses the appellant from liability for theft which results from causes beyond its control; the language, therefore, does not affect the defendant's liability for negligent acts.

We think there is some merit to the appellee's argument, but because of our view of the remaining issue in the case, we pretermit this contention. For the sake of argument, we assume that the language used in the form is effective to excuse the defendant's liability for theft whether or not the theft could, in the exercise of ordinary care, have been prevented.

We turn now to the appellee's contention that the language in the printed form excusing the appellant from liability for theft did not become a part of the contract between the parties. To support this proposition the appellee cites *Savoy Hotel Corp. v. Sparks*, 57 Tenn.App. 537, 421 S.W.2d 98 (1967), in which the plaintiff left his car in a hotel parking garage and was issued a claim check with the following language printed on it:

"Not responsible for damage by fire, storm, theft, accident, nor for articles left in car. Cars left after closing time at owner's risk."

Quoting from a prior New York case, the Court of Appeals held that the exculpatory language printed on the claim check did not become a part of the contract of bailment. The Court said:

"The plaintiff having had no knowledge of the existence of the special contract limiting the liability of the defendant ... and not being chargeable with such knowledge, the minds of the parties never met thereon, and the plaintiff cannot be deemed to have assented thereto, and is not bound thereby.

\* \* \* \* \* \*

If the plaintiff knew that the defendant had limited its liability ... either by his attention being called to it or otherwise, then, of course, the law would deem him to have assented to it, so that a binding contract would be effected. If he did not know it, I think the law imposed no duty upon him to read his check to find whether or not there was a contract printed thereon, or that he was guilty of neglect in not so reading it, because he had no reason to apprehend that a contract was printed thereon." 421 S.W.2d at 103–04.

The appellant contends, however, that the rule announced in *Savoy Hotel* applies only to cases involving an unsigned claim check; that there is a different rule in a case involving a signed agreement. The appellant relies on the cases of *DeFord v. National Life and Accident Insurance Co.*, 182 Tenn. 255, 185 S.W.2d 617 (1945) and *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960) in support of this contention. Perhaps the strongest statement of the rule relied on by the appellant is found in *DeFord* where the court said:

It is the general rule that "a person cannot avoid a written contract into which he has entered on the ground that he did not attend to its terms, that he did not read the document." ...

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he

did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission." 182 Tenn. at 266, 185 S.W.2d 617.

It is interesting to note that the court in *DeFord* also held that the fact that the person signing the contract could not read was no defense; that an illiterate person has a duty to obtain help in reading the agreement and an explanation of its terms before he signs it.

Where does the writing in the present case fall? In the modern view of contract formation involving a form furnished by one of the parties, we think the rule lies somewhere between *Savoy Hotel* and *De-Ford*. Professor Karl Llewellyn has led the effort to arrive at a realistic determination of the terms of a writing that should bind the parties. Working in the specific area of contracts for the sale of goods as one of the principal authors of Article 2 of the Uniform Commercial Code, Professor Llewellyn fought for some general principles which we find should be applied to all contract cases. Recognizing that one of the fundamental concepts of contract law is the concept of *assent*, he said:

> Instead of thinking about "assent" to boilerplate clauses, we can recognize that so far as concerns the specific, there is no assent at all. What has in fact been assented to, specifically, are the few dickered terms, and the broad type of the transaction, and but one more. That one thing more is a blanket assent (not a specific assent) to any not unreasonable or indecent terms the seller may have on his form, which do not alter or eviscerate the reasonable meaning of the dickered terms. The fine print which has not been read has no business to cut under the meaning of those dickered terms which constitute the dominant and only real expression of agreement, but much of it commonly belongs in. K. Llewellyn, *The Common Law Tradition: Deciding Appeals § 370 (1960).*

Other writers have referred to the binding terms of an agreement as the "circle of assent." See J. Murray, *On Contracts,* § 352–353, 2d Revised Edition (1974). Again, working in the specific area of contracts for the sale of goods, Professor Murray uses an analysis that deserves general application. He says:

> It must be emphasized that the assent analysis is not premised upon the actual assent of the parties. Parties to a contract rarely consciously advert to any number of terms which are binding upon them. If such terms allocate the risks of the bargain in a manner which the parties should have reasonably expected, they are enforceable—they are, to use the expression of Karl Llewellyn, "decent" terms. If the terms of the contract suggest a reallocation of material risks, an attempted reallocation may be so extreme that regardless of apparent and genuine assent, a court will not enforce it. However, in less extreme situations, the parties may reallocate the risks of their bargain and such a reallocation will be judicially sanctioned *if there is both apparent and genuine assent to it.* The parties will not be found to have agreed to an abnormal allocation of risks if the only evidence thereof is an inconspicuous provision in the boilerplate of the standard form. At a minimum, the reallocation must be physically conspicuous. Beyond that, it must have been manifested in a fashion comprehensible to the party against whom it is sought to be enforced. Finally, such party must have had a reasonable choice in relation to such reallocation. Absent these safeguards, the reallocation must be disregarded by courts since to enforce the provision evidencing it would be to enforce an "indecent" provision. The provision is raised to the level of decency only if the party against whom it will operate has apparently and genuinely assented to be bound thereby. *Id.* § 353.

We adopt the above principles as the ones that govern the determination of the binding terms of a contract under the circumstances of this case; that is, the

party who signs a printed form furnished by the other party will be bound by the provisions in the form over which the parties actually bargained and such other provisions that are not unreasonable in view of the circumstances surrounding the transaction.

We realize that this formulation sounds like an application of the doctrine of unconscionability to the provisions in the written contract that the court finds to be unreasonable. *See* Eddy, *On The "Essential" Purposes of Limited Remedies: The Metaphysics of UCC § 2–719(2)*, 65 Calif.Rept. 28 (1977). However we are not dealing with that concept here—although it may be applicable in another setting we think it is simply a matter of ascertaining the agreement of the parties in light of modern notions of fair play: a matter of finding the elusive "circle of assent" which contains the agreement of the parties.

■ With these principles in mind, we think the language relied on by the appellant did not fall within that circle of assent and therefore did not become a part of the agreement between the parties. The provision is hidden in the fine print above the appellee's signature; the section is headed by larger print "Terms cash unless arrangements made." Then appearing in larger print immediately above the appellee's signature are the terms of the parts warranty. There is no indication in the record that the provision contained in the fine print was pointed out to the appellee or that a person of ordinary intelligence and experience would expect that the signed writing relieved the appellant of all liability for damages which might occur while the automobile was in its possession. Therefore, the provision relied on by the appellant did not relieve it from liability for theft of the automobile which the trial judge found to be a result of the appellant's negligence.

The judgment of the court below is affirmed. The cause is remanded to the Circuit Court of Rutherford County for any further proceedings necessary. Tax the costs on appeal to the appellant.

TODD, P.J. (M.S.), and LEWIS, J., concur.

**DAVIES OLDSMOBILE-CADILLAC, Inc.**
631 N.W. Broad St. — MURFREESBORO, TN. 37130
Murfreesboro Phone: 893-6420    Nashville Phone: 244-8736
"WE ARE KNOWN FOR THE PROMISES WE KEEP"

A.O. NUMBER: 10274    DATE: 1-29-85    VEHICLE IDENTIFICATION NO.

SVC. TAG NO. 10274

CUSTOMER NAME: Ed Foster Curi Store
ADDRESS: 1319 N.W. Broad
CITY/STATE: M Boro  TN.  ZIP: 37130

BUS. PHONE: 895-2737

□ CASH   □ CHARGE   CREDIT CARD   □ BANK AMERICARD   □ MASTER CHARGE

**TERMS CASH:**

SERVICE PARTS WARRANTY

| W | QTY | PART NO. OR DESCRIPTION | SALE |
|---|---|---|---|
| 6700 | 1 | 7847423 Plugs | 13.50 |
| 25 | 1 | 1613546 Ext | 11.10 |
| 3.33 | 1 | 7443641 Housing | 146.00 |
| 109.50 | 1 | 1494644 | 1.65 |
| 1.24 | 1 | 7844651 | 16.48 |
| 10.30 | 1 | 7911495 Plate | 5.40 |
| 4.65 | 1 | 7834218 Cover | 76.50 |
| 60.00 | 1 | 7834643 Con | 74.60 |
| 55.50 | 1 | 7x27031 Kent | 6.35 |
| 4.96 | | | |

**LABOR INSTRUCTIONS**

① Repair Shift
Column  Replace & Repair
'80 Cab Damaged  Back First Steel tube
to steering coupler
② Raise Rear Wheels
③ Replace View
B/6 scale

WARRANTY CLAIMS
462: 472: 466: 476: 480E 479: 490: 491: 464:
263: 263:

PARTS & ACCESSORIES & SERVICE SALES
460: 470: 466: 476: 467: 477: 479: 491:
324: 220: 225:

TOTAL SUBLET REPAIRS

GAS - OIL - GREASE

TOTAL GAS - OIL - GREASE