**BOARD OF DIRECTORS OF the CITY OF HARRIMAN SCHOOL DISTRICT, Plaintiff–Appellee,**

v.

**SOUTHWESTERN PETROLEUM CORPORATION and Roy D. Tate, Defendants–Appellants.**

Court of Appeals of Tennessee, Eastern Section.

Jan. 14, 1988.

Douglas L. Dutton and J. William Coley, Knoxville, for defendant-appellant, Southwestern Petroleum Corp.

William A. Newcomb, Harriman, for plaintiff-appellee.

## OPINION

ANDERSON, Judge.

Southwestern Petroleum Corporation ("SWEPCO") and Roy D. Tate ("Tate"), Defendants, appeal a $17,000 Circuit Court non-jury judgment in Roane County in favor of the plaintiff school district in a breach of contract action arising out of the failure of a school roof repair in Harriman, Tennessee.

## FACTS

The Bowers Elementary School in Harriman was built in 1960. Its roof is essentially flat, sloping slightly to the middle of the building in a "V" configuration with drain openings located at the base of the "V" to carry away runoff water. The roof covering originally was graveled hot asphalt over roofing felt, applied over the frame's decking and insulation. In the years following initial construction, the roof leaked intermittently, but the leaks were patched by the school system's maintenance staff. In 1976, the entire surface was re-roofed with a new layer of roofing felt and hot asphalt, but by early 1981, the roof again had begun leaking. On June 25, 1981, the Board of Directors of the City of Harriman School District ("Board of Education") published the following invitation to bid in two local newspapers, soliciting bids for the patching and sealing of the Bowers Elementary School roof and the roof of the Board's administration office:

## INVITATION TO BID

Bids will be accepted at the office of Jack S. Williams, Superintendent of Schools, 1002 Roane Street, Harriman, Tennessee until 2:00 P.M. on July 7, 1981, for the patching and sealing of the roofs on Bowers Elementary School, located on Ruritan Road, and the Administration Office, 1002 Roane Street, Harriman, Tennessee. Cracks, blisters, open seams and fish mouths shall be repaired with a heavy duty asphalt base, waterproof and mastic. This mastic shall meet or surpass the following specifications: ASTM designation D2822-75, Type 1, U.S. Federal Specifications SS-C-153-C, Type 1. After roof has been patched, the entire surface shall be coated with a protective roofing coating. The coating shall meet or exceed U.S. Federal Specifications SS-A-00694D and ASTM Designation D2823-75, Type 1. The coating is to be a black semi-mastic asphalt roof coating designed to water-proof, protect and preserve roofs.

Bids should include labor and material for each of the buildings, and the total for both buildings. Labor and material shall be guaranteed for a period of time not less than six (6) years.

Bids will be opened at the regular board meeting on July 7, 1981 in the Board Room of the Administration Building.

/s/ Jack S. Williams
Superintendent of Schools

Earlier that same year, Roy Tate, expecting to be laid off from his job in Oak Ridge, answered a classified newspaper advertisement soliciting applications for sales representatives for SWEPCO. On April 23, 1981, Tate entered into a "selling agreement" with SWEPCO by which he was given authority to "solicit orders for the sale by [SWEPCO] of only its products and not the application thereof." Tate had some twenty-two years of part-time experience in the roofing business at the time he entered into the agreement with SWEPCO.

Tate responded to the bid solicitation, but before submitting the bid, he inspected the roof himself, taking pictures of its condition and measuring the total area to be repaired. He then submitted this information to his regional sales manager at SWEPCO. Based on the sales manager's representations, Tate submitted a bid to the Board of Education for repairing the roofs of the Bowers school and the other building, noting that "the material used on these two buildings will correspond with the bidding specifications as advertised in the paper." Tate's handwritten bid continued that it was "fully guaranteed for 6 full years with written guarantee," and that "labor is also guaranteed, will repair free if leaks occur, or any fault in material."

On July 15, 1981, the Board of Education approved its Superintendent's "signing a contract with stipulations as needed with the low bidder, Roy Tate, for $8,032.90." The next day the Superintendent, Jack Williams, signed a "SWEPCO ORDER FORM" in the amount of $7,474.40 for the materials to be used in the roof repair. The materials contract was directly between the Board of Education and SWEPCO, noting that it was "a contract for the purchase of materials only and not for the

application thereof." The following day, July 17, 1981, Superintendent Williams, on behalf of the Board of Education, entered into a labor contract directly with Roy Tate for the actual labor needed in repairing the roof. Williams was surprised at the total amount of Tate's labor bid—$315 for both roofs—and "assumed that SWEPCO was into it with him." Tate explained to Williams that SWEPCO required Tate to have separate contracts for the labor and materials.

On July 26, 1981, Williams signed the "SWEPCO ROOF PRODUCTS LIMITED GUARANTY REGISTRATION CARD" attached to a "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE" that Tate had provided him that day. Shortly thereafter, in August 1981, SWEPCO shipped the materials, and Tate performed the patching and recoating work called for in the bid specifications.

The roof repair failed miserably. Almost immediately the roof began to leak worse than it had before the repair work was done, and subsequent attempts by both Tate and the school maintenance staff to repair the leaks with material provided by SWEPCO also failed. Every time it rained throughout the next twelve months, water poured into the building in such quantities that the school maintenance staff installed gutter systems *inside* the building to drain the leaks into 55–gallon drums, and stretched plastic sheeting across the hallways in order to provide at least minimal protection to the students and staff so that school could continue. Because of the water damage resulting from the botched repair, the Board of Education had to replace a variety of school supplies, books, lockers, and window louvers, and had to repair light fixtures and floor tiles, and repaint doors, ceilings, and walls.

The Board of Education brought this action against SWEPCO and Tate to recover for damages to the building and its contents, alleging breach of contract and negligent misrepresentation. A non-jury trial was held on February 7, 1986, at which time the trial court found for the Board of Education and awarded $17,000 in damages. The trial court's finding of fact noted that Tate, as representative of SWEPCO, told the Board of Education that "his company had the product especially designed for this type of construction." The trial court further found that following Tate's statement and "the advertisement regarding the product of defendant company," the Board of Education contracted with the Defendants "for the repair and preservation of the roof." Finally, the trial court found that "the product failed to do what it was warranted to accomplish" and caused "great ruin to the building and its contents." The trial court concluded that the corporation, through Tate, had committed breach of warranty. This appeal followed.

## ISSUES

SWEPCO contends that the trial court erred in awarding judgment to Plaintiff because SWEPCO had disclaimed all warranties except those provided in its standard limited guarantee, because it had excluded liability for consequential damages, because Tate did not have the authority to bind SWEPCO to any obligations beyond those outlined in its order form and standard guarantee, because the materials it provided were neither defective nor unmerchantable, and because the damages resulted from Tate's misuse of SWEPCO's materials.

*Agency.*

There is no dispute among the parties that Tate was the agent of SWEPCO in the sale of the materials used in the unsuccessful roof repair. Tate was granted the actual authority by SWEPCO to "solicit orders for the sale by [SWEPCO] of only its products and not the application thereof," and it follows that Tate's actual authority also encompassed the implied authority to make representations regarding the suitability of a particular product for a particular application. *See Cooper Paintings & Coatings, Inc. v. SCM Corp.,* 62 Tenn.App. 13, 19, 457 S.W.2d 864, 866–867 (1970) (finding authority in agent "for the purpose of advising prospective customers of the quality of its products" in case involving representa-

tions regarding roof coating materials). SWEPCO argues that Tate's sole exercise of his agency was in filling out the order form, and that all other actions on his part were in his status as contractor for the Board of Education. The proof shows otherwise.

■ The existence of agency and the scope of an agent's authority under that agency are both fact determinations. *See V.L. Nicholson Co. v. Transcon Inv.*, 595 S.W.2d 474, 483 (Tenn.1980). The evidence developed at trial shows clearly that Tate's inspection of the roof and his negotiating the contract with the Board of Education were in his capacity as agent for SWEPCO. The materials ordered were ordered because Tate had consulted with SWEPCO— reporting the results of his inspection of the roof and sending SWEPCO photographs of the roof—in order to determine which of SWEPCO's many products were proper for the repair job. Based on SWEPCO's communications to him, Tate solicited the Board of Education's order for the "Topcoat Roof Maintenance System."

*Warranty and Warranty Exclusion.*

■ Tennessee Code Annotated § 47–2–313 reads as follows:

**Express warranties by affirmation, promise, description, sample.**—(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller

use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

(1979). The evidence is clear that SWEPCO's representing that the Topcoat System was the proper one to repair the roof became part of the basis of the bargain, induced the Board of Education to enter into the contract, and thus created "an express warranty that the goods shall conform to the affirmation or promise." Had SWEPCO, through Tate, informed the Board of Education that the Topcoat System would be ineffective to patch the roof and in fact would increase substantially the number and volume of leaks and thus cause significant damage to the building and its contents, the Board of Education undoubtedly would not have entered into the contract to purchase that material from SWEPCO.

■ SWEPCO's representations also created an implied warranty of fitness for a particular purpose. Tennessee Code Annotated § 47–2–315 reads as follows:

**Implied warranty—Fitness for particular purpose.**—Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

(1979). SWEPCO, through its agent Tate, knew the particular purpose for which the goods were required and that the Board of Education was relying on SWEPCO's skill or judgment to select or furnish suitable goods.

■ SWEPCO argues, however, that ther the express warranty that induced Board of Education to enter into the tract nor the implied warranty of fit for a particular purpose apply here be

they were excluded as permitted by Tennessee Code Annotated § 47–2–316, which in pertinent part reads as follows:

**Exclusion or modification of warranties.**—(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence (§ 47–2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to subsection (3), ... to exclude or modify any implied warranty of fitness the exclusion must be by a writing and *conspicuous*. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding subsection (2):

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

.    .    .    .    .

(4) Remedies for breach of warranty can be limited in accordance with the provisions of this chapter on liquidation or limitation of damages and on contractual modification of remedy (§§ 47–2–718 and 47–2–719).

. . . .

(1979) (emphasis added). SWEPCO asserts that the warranty provisions were excluded under the language of the "SWEPCO OR-DER FORM" and the "SWEPCO ROOF RODUCTS LIMITED GUARANTEE." cannot agree that these documents ply with the letter or intent of the rm Commercial Code and the Tennessees construing it.

EPCO relies on language on the back "SWEPCO ORDER FORM"—a form perintendent Williams signed. In a small block on the back of the form with the heading "Conditions" rests the following language in extremely small print:

It is mutually agreed between buyer and seller that this non-cancellable order contains the entire agreement of the parties. Neither buyer nor seller shall be bound by any agreements, representations or warranties either express or implied including the warranty of fitness for a particular purpose not shown on the original of this order. No verbal statements or agreements shall vary any part of this contract.

There follows further language equally small but in bolder type disclaiming responsibility for resale application and damages resulting from application, and then a further paragraph in the same extremely small print regarding credit, title, interest, collection, and shipment.

In *Parton v. Mark Pirtle Oldsmobile–Cadillac–Isuzu, Inc.,* this Court discussed at length the allocation of material risks between parties to a contract and the re-allocation of those risks by the assent of the parties. Judge Cantrell cogently pointed out that

the parties may reallocate the risks of their bargain and such a reallocation will be judicially sanctioned *if there is both apparent and genuine assent to it.* The parties will not be found to have agreed to an abnormal allocation of risks if the only evidence thereof is an inconspicuous provision in the boilerplate of the standard form. At a minimum, the reallocation must be physically conspicuous. Beyond that, it must have been manifested in a fashion comprehensible to the party against whom it is sought to be enforced. Finally, such party must have had a reasonable choice in relation to such reallocation. Absent these safeguards, the reallocation must be disregarded by courts since to enforce the provision evidencing it would be to enforce an "indecent" provision. The provision is raised to the level of decency only if the party against whom it will operate has apparently and genuinely assented to be bound thereby.

730 S.W.2d 634, 637 (Tenn.Ct.App.1987) (emphasis in original) (quoting verbatim from J. Murray, *On Contracts,* § 353, 2d Revised Edition (1974)).

In *Parton,* the contractual language examined was an exculpatory clause in a standard automobile repair form. Commenting on the effect of that clause, the Court stated:

> [W]e think it is simply a matter of ascertaining the agreement of the parties in light of modern notions of fair play: a matter of finding the elusive "circle of assent" which contains the agreement of the parties.
>
> With these principles in mind, we think the language relied on by the appellant did not fall within that circle of assent and therefore did not become a part of the agreement between the parties. The provision is hidden in the fine print above the appellee's signature; the section is headed by larger print "Terms cash unless arrangements made." Then appearing in larger print immediately above the appellee's signature are the terms of the parts warranty. There is no indication in the record that the provision contained in the fine print was pointed out to the appellee or that a person of ordinary intelligence and experience would expect that the signed writing relieved the appellant of all liability for damages which might occur while the automobile was in its possession.

730 S.W.2d at 638.

Under the Uniform Commercial Code adopted by the General Assembly:

> "Conspicuous" means a term or clause so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals ... is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.... Whether a term or clause is "conspicuous" or not is for decision by the court.

Tenn.Code Ann. § 47–1–201(10) (1979). As we held in *Parton,* "the party who signs a printed form furnished by the other party will be bound by the provisions in the form *over which the parties actually bargained and such other provisions that are not unreasonable in view of the circumstances surrounding the transaction.*" 730 S.W.2d at 637–638 (emphasis added). The proof is clear that the parties here did not actually bargain over that disclaimer provision. It is further clear that in light of all the circumstances surrounding the transaction, the inconspicuous, boilerplate, standard-form, reallocation of material risks was never part of the "circle of assent" of the transaction.[1]

SWEPCO cites us to Tennessee Code Annotated § 47–2–316(3)(a), which points out that, notwithstanding the requirement of subsection (2) that exclusions be conspicuous, "unless circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls a buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." This statutory language, however, has been strictly construed by this Court. *See, e.g., Hull–Dobbs, Inc. v. Mallicoat,* 57 Tenn.Ct.App. 100, 105, 415 S.W.2d 344, 346–47 (1966) (holding that words "accepted in its present condition" are not synonymous with "as is," "with all faults," and similar expressions that call a buyer's attention to the exclusion of warranties under § 47–2–316). The exceptions to the general rule reflected by the language of § 47–2–316(3) "are common factual situations in which the circumstances surrounding the transaction are in themselves sufficient to call a buyer's attention to the fact that no implied warranties are made or that certain implied warranties are being excluded." Comment 6, § 47–2–316 (emphasis added). We do not believe that the language of subsection (3) negates the requirement of subsection (2) that exclusionary language be conspicuous. Rather, it

---

1. Had SWEPCO taken the simple step of highlighting in yellow pen the clauses in question—as its attorney did at trial—it would have had a far more convincing argument regarding its attempted disclaimer.

allows an alternate choice of the language itself. For instance, even with the particular words "as is," no implied warranties would be excluded if those words were buried in the midst of a fine-print, boilerplate, standard-form clause. The keys to an effective disclaimer are notice and assent, and one can neither notice nor assent to that which one has not seen.

For the same reason, we do not find that SWEPCO modified or excluded any express or implied warranty through its "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE." The Board of Education's invitation to bid requested a six-year guarantee, and Tate's bid noted that it would guarantee the materials for six years. Based on those writings, Superintendent Williams signed the "SWEPCO ORDER FORM." Some ten days later, Tate presented him with the "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE," which, on its face, lists thirteen different SWEPCO roof systems with the number of years guaranteed listed next to a check-off box. The testimony showed that the "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE" presented to Superintendent Williams was checked in the box beside "SWEPCO Topcoat Roof Maintenance System 6–year guarantee." Williams signed the "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE REGISTRATION CARD" attached to the bottom of the "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE." The card itself contained no words of disclaimer, but state only that

> I have read the SWEPCO Roof Product Limited Guarantee provided above and on the reverse side hereof and agree to its terms. The original guarantee has been left with me, I am authorized to accept it, and I request that when the accompanying order for the products is approved by SWEPCO, that this limited guarantee be registered in the name of the purchaser.

*Limitation of Remedy.*

■ SWEPCO argues that because Williams signed the "SWEPCO ROOF PRODUCTS LIMITED GUARANTEE REGISTRATION CARD," SWEPCO effec-

tively limited the Board of Education's remedies under the contract. We cannot agree. Parties to a contract may modify or limit the remedies available under that contract under the terms of Tennessee Code Annotated § 47–2–719, which in pertinent part reads as follows:

> **Contractual modification or limitation of remedy.**—(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages:
>
> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
>
> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chapters 1 through 9 of this title.
>
> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

(1979). We believe that the provisions of subsection (2) control, and that SWEPCO's limitation of remedy provision fails of its essential purpose. Comment 1 to § 47–2–719 points out that

> it is of the very essence of a sales contract that *at least minimum adequate remedies be available.* If the parties intend to conclude a contract for sale within this article [Chapter] they must accept the legal consequence that there be at least a fair quantum of remedy for

breach of the obligations or duties outlined in the contract.... Under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this article [Chapter].

(emphasis added). SWEPCO's clause purportedly limiting the remedy states that "the full extent of SWEPCO's liability under this guarantee is to supply sufficient amounts of its products as determined solely by SWEPCO to repair the leaking area without exceeding the total price of the original purchase." The proof adduced at trial was that on more than one occasion after having been apprised of the failure of the Topcoat System, SWEPCO sent materials to the Board of Education, which both Tate and the school system's maintenance staff used in their attempts to repair the extensive leaks. Those attempts to repair with materials provided by SWEPCO failed just as miserably as the original attempt to repair the roof. Because SWEPCO provided the wrong materials, no amount of which could repair the leaking roof, the Board of Education was deprived of the "minimum adequate remedies" mandated by the statute. Therefore, the limitation of remedy failed of its essential purpose, and the Board of Education was free to seek other relief granted it by the statute.[2] *See Benco Plastics, Inc. v. Westinghouse Electric Corp.,* 387 F.Supp. 772, 779–81 (E.D. Tenn.1974); *Moore v. Howard Pontiac– American, Inc.,* 492 S.W.2d 227, 229 (Tenn. Ct.App.1972).

*Other issues.*

The parties dispute whether the roofing materials were defective or unmerchantable. We need not discuss either proposition at length in light of the proof adduced at trial. Under Tennessee Code Annotated § 47–2–314(2),

(2) Goods to be merchantable must be at least such as:

    (a) pass without objection in the trade under the contract description; and

    (b) in the case of fungible goods, are of fair average quality within the description; and

    (c) are fit for the ordinary purposes for which such goods are used; and

    (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

    (e) are adequately contained, packaged, and labeled as the agreement may require; and

    (f) conform to the promises or affirmations of fact made on the container or label if any.

    ....

(1979). The testimony is undisputed that SWEPCO had sold "thousands" of the Topcoat Roof Systems, and apparently had never had a complaint before this one. The issue is not whether the Topcoat System was unmerchantable or defective—clearly it is a merchantable and fit system for certain roofs. The problem is that it was not the fit system for *this* roof.

SWEPCO insists that because the "SWEPCO ORDER FORM" was filled out to show that the roof deck and roof surface were only two years old, the blame for SWEPCO's providing the wrong material should rest on Tate or the Board of Education. The proof at trial was that the roof on the Bowers Elementary School was more than twenty years old and that it had been re-roofed once. SWEPCO's experts pointed out that the Topcoat System should not be used, as a general rule, on a roof that is more than five years old or that has other than its original roof surface. The proof shows, however, that neither Tate nor the Board of Education ever asserted that the roof was only two years old. In fact, the only evidence in the record regarding who might have provided that informa-

---

**2.** Even if the attempted limitation of remedy did not fail of its essential purpose, we would still find the limitation ineffective, based on the policy reasoning expressed in *Parton,* because it

simply did not fall within "the elusive 'circle of assent' which contains the agreement of the parties." 730 S.W.2d at 638.

tion was the testimony of Riad Nimri, SWEPCO's Vice–President of Technical Affairs, who stated that although the sales representative normally would fill out the information regarding a roof's age,

> there's another procedure. He may send this form without this information, and his regional manager, or the manager, the sales manager for that area, would call him and obtain the information by phone.

Since Tate had already testified that he did not provide that information to SWEPCO, the issue was one of the credibility of witnesses. "The findings of fact of the trial judge involving the credibility of witnesses are entitled to great weight on appeal." *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 849 (Tenn.Ct.App.1982) (citation omitted). The evidence does not preponderate against the trial court's implicit finding that neither Tate nor the Board of Education misrepresented the age of the roof.

▪ Similarly, the preponderance of evidence is that Tate applied the Topcoat system in accordance with the directions for application provided by the company. The school principal, who was an experienced construction contractor, was satisfied with Tate's application. Bruce Cherry, SWEPCO's own expert witness, testified that, "as far as applying SWEPCO Topcoat, just about anyone could take a brush and a bucket of coating, and if he knows how to put on paint he could put our Topcoat on." Certainly, Tate applied the system to a roof deck to which it should not have been applied, but his process of application was more than adequate under the guidelines provided by SWEPCO.

The fundamental problem with the entire transaction is that SWEPCO created an agency in Tate but made only minimal efforts to train Tate to perform those duties of his agency that SWEPCO now insists he should have performed. SWEPCO, "having sent out its agent, clothed with plenary powers, to represent it in a matter vital to its interest, and having accepted the fruits thereof must abide the consequences." *Howard v. Haven*, 198 Tenn. 572, 583, 281 S.W.2d 480, 485 (1955) (citations omitted).

The law of Tennessee is clear that "a principal generally is bound by its agent's acts done in its behalf and within the actual or apparent scope of the agency.... The agent ordinarily does not incur liability unless it is shown that he intended to be personally responsible for his actions." *V.L. Nicholson Co.*, 595 S.W.2d at 483 (citations omitted). This was Tate's first job for the Board of Education, and he testified that he had wanted to perform well in order to get more jobs. Tate attempted in good faith to perform his duties as sales representative for SWEPCO, and there is no showing that he intended to be personally responsible for his actions. The liability for damages arising as a result of the failed roof repair, therefore, rests on SWEPCO alone.

For the foregoing reasons, the judgment of the trial court is affirmed as to SWEPCO, reversed as to Tate, and remanded. Costs of this appeal are taxed to SWEPCO.

GODDARD and FRANKS, JJ., concur.