IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 29, 2017 Session

**FREDERICK COPELAND v. HEALTHSOUTH/METHODIST REHABILITATION HOSPITAL, LP, ET AL.**

**Appeal from the Circuit Court for Shelby County**
**No. CT-000196-16  Rhynette N. Hurd, Judge**
_____

**No. W2016-02499-COA-R3-CV**
_____

This is an appeal from the grant of summary judgment in favor of Appellee. Following Appellant's knee surgery, Appellee provided Appellant transportation, by wheelchair van, from the rehabilitation hospital to a follow-up appointment with his surgeon. Prior to transport, Appellant signed an exculpatory agreement, releasing Appellee from all claims of ordinary negligence. Appellant was injured when he fell while trying to enter the van and filed suit against Appellee for negligence. The trial court granted summary judgment in favor of Appellee, finding that the exculpatory agreement was enforceable. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Donald K. Vowell, Knoxville, Tennessee, David E. Gordon and Erin L. Hillyard, Memphis, Tennessee, for the appellant, Frederick Copeland.

Diana M. Comes, Memphis, Tennessee, for the appellee, MedicOne Medical Response Delta Region, Inc.

**OPINION**

**I. Background**

On December 2, 2014, Appellant Frederick Copeland, who was 77 years old at the

time, was an inpatient at HealthSouth/Methodist Rehabilitation Hospital, LP ("HealthSouth"), in Memphis, where he was recuperating from total knee replacement. Mr. Copeland had a follow-up appointment scheduled with his orthopedic surgeon that day, and HealthSouth arranged for MedicOne Medical Response Delta Region, Inc. ("MedicOne," or "Appellee") to transport Mr. Copeland to the appointment and back to the rehabilitation facility. After the appointment, Mr. Copeland was injured when he fell while getting back into the MedicOne transport van. Prior to transport, Mr. Copeland signed a Wheelchair Van/Transportation Run Report ("Run Report"), in which he acknowledged that "MedicOne . . . is NOT covered by Medicare or Medicaid. MedicOne wheelchair vans are not an ambulance and no care will be given by the MedicOne Technician." Prior to transport, Mr. Copeland also signed a Wheelchair Van Transportation Agreement ("Agreement"). The Agreement, which was between MedicOne and Mr. Copeland, stated that it was for "transportation" services. In addition, the Agreement acknowledged that "there are inherent risks associated with such transportation which pose a risk of harm or injury." Furthermore, the Agreement stated that Client, i.e., Mr. Copeland "SPECIFICALLY RELEASES AND FOREVER DISCHARGES MEDICONE RELATED PARTIES FROM ANY AND ALL CLAIMS ARISING DIRECTLY OR INDIRECTLY FROM OR AS A RESULT OF THE NEGLIGENCE (BUT NOT GROSS NEGLIGENCE OR WILLFUL MISCONDUCT) OF MEDIC ONE RELATED PARTIES."

On January 19, 2016, Mr. Copeland filed a complaint against HealthSouth and MedicOne, alleging that MedicOne was negligent in failing to: (1) "exercise reasonable and ordinary care in the transportation of [Appellant] to and from his medical appointment;" (2) "assist [Appellant] in his entry and exit of the medical transportation vehicle;" (3) "meet the standard of care required of medical transportation drivers in the transfer of patients to and from a medical transportation vehicle;" and (4) "train the particular driver in the proper transfer of patients to and from a medical transportation vehicle." Concerning HealthSouth's alleged liability, Mr. Copeland averred that "MedicOne was contracted by HealthSouth to provide transportation to [Appellant]. All of the allegations of negligence against MedicOne are, therefore, made against HealthSouth on the basis of agency and the doctrine of respondeat superior."

On February 26, 2016, MedicOne filed a motion to dismiss or, alternatively, for summary judgment, arguing, *inter alia*, that Mr. Copeland had signed the Agreement, which contained a release and waiver of all claims of ordinary negligence against MedicOne. Based on this Agreement, and the doctrine of express assumption of the risk, MedicOne argued that Mr. Copeland could not recover. On April 7, 2016, Mr. Copeland filed a response, arguing that the release and waiver provision in the Agreement was an unconscionable adhesion agreement; alternatively, Mr. Copeland argued that the Agreement was one for professional services and should be invalidated.

At the hearing on MedicOne's motion, Mr. Copeland argued that the services provided were medical services, not merely transportation services, and that the **Olson v. Molzen** formula for determining whether exculpatory clauses were invalid as against public policy applied, *see* discussion *infra*. Mr. Copeland also reiterated his unconscionable adhesion argument. The trial court was unpersuaded by Mr. Copeland's argument and granted MedicOne's motion for summary judgment by order of November 7, 2016. Thereafter, HealthSouth filed a Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss the complaint, arguing that it could not be held liable for Mr. Copeland's injuries in view of the fact that MedicOne had been dismissed from the lawsuit. The record does not contain an adjudicatory order on HealthSouth's motion; however, the November 7, 2016 order granting summary judgment contains Tennessee Rule of Civil Procedure 54.02 language. Thus, it appears that the order appealed is final so as to confer jurisdiction on this Court. HealthSouth is not a party to this appeal.

## II. Issues

Mr. Copeland's brief lists 14 issues; however, it appears that Appellee's statement of the issue is a more accurate reflection of the appeal. Restated slightly, Appellee's statement of the issue is:

> Whether the trial court erred in granting summary judgment in favor of Appellee on its finding that the Wheelchair Van Transportation Agreement between MedicOne and Mr. Copeland contained an enforceable exculpatory clause barring Appellant's claim for ordinary negligence.

## III. Standard of Review

A trial court's decision to grant a motion for summary judgment presents a question of law. Therefore, our review is de novo with no presumption of correctness afforded to the trial court's determination. **Bain v. Wells**, 936 S.W.2d 816, 622 (Tenn. 1997). This Court must make a fresh determination that all requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. **Abshure v. Methodist Healthcare–Memphis Hosps**., 325 S.W.3d 98, 103 (Tenn. 2010). When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. According to the Tennessee General Assembly:

> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
>
> 1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or

2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101. Furthermore,

> "[w]hen a motion for summary judgment is made [and] ... supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" at the summary judgment stage "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* [*Ltd. v. Zenith Radio Corp*.], 475 U.S. [574,] 586, 106 S. Ct. 1348 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 265 (Tenn. 2015).

### IV. Analysis

The gravamen of Appellant's appeal lies in the resolution of the question of whether the exculpatory clause, in the Agreement, can be enforced so as to bar Appellant's recovery for the alleged negligence of MedicOne and/or its employee. There is no dispute that Mr. Copeland signed the Run Report and the Agreement. As set out above, the language used in these documents is not ambiguous. The Run Report clearly states that "no care will be given by the MedicOne Technician." The Agreement definitively states that Mr. Copeland releases "MedicOne related parties from any and all claims arising directly or indirectly from or as a result of the negligence . . . of MedicOne related parties." As the Tennessee Supreme Court has explained:

> It is well settled in this State that parties may contract that one shall not be liable for his negligence to another but that such other shall assume the risk incident to such negligence.... Further, it is not necessary that the word 'negligence' appear in the exculpatory clause and the public policy of Tennessee favors freedom to contract against liability for negligence.

*Empress Health and Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188 (Tenn. 1973). In arguing that the exculpatory clause is not enforceable, Mr. Copeland relies on the Tennessee Supreme Court case of *Olson v. Molzen*, 558 S.W.2d 429 (Tenn. 1977),

wherein the Court held that certain relationships required greater responsibility which would render such a release "obnoxious." *Id.* at 430. The ***Olson*** Court adopted the opinion of the California Supreme Court in ***Tunkl v. Regents of University of California***, 60 Cal.2d 92, 32 Cal. Rptr. 33, 383 P.2d 441 (Ca. 1963), which held that where the public interest would be affected by an exculpatory provision, such provision could be held invalid. *Id.* at 431. In ***Olson***, the Court adopted the six criteria set forth in ***Tunkl*** as useful in determining when an exculpatory provision should be held invalid as contrary to public policy. These criteria are:

> (a.) It concerns a business of a type generally thought suitable for public regulation.
> (b.) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.
> (c.) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.
> (d.) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.
> (e.) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.
> (f.) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

***Olson***, 558 S.W.2d at 431. Applying the foregoing factors, the ***Olson*** Court invalidated a contract between a doctor and patient that attempted to release the doctor from liability for his negligence in the performance of medical services. *Id.* Importantly, the ***Olson*** Court clearly stated that the exceptions to the general rule of express assumption of the risk were adopted because the general rule does

> not afford a satisfactory solution in a case involving a professional person operating in an area of public interest and pursuing a profession subject to licensure by the state. The rules that govern tradesmen in the market place are of little relevancy in dealing with professional persons who hold themselves out as experts and whose practice is regulated by the state.

- 5 -

*Id.* at 430. Indeed, a review of relevant Tennessee cases indicates that the exceptions adopted in *Olson* have generally been restricted to those situations involving professional services, such as legal services, medical treatment, and home-inspections. *See, e.g.*, ***Thrasher v. Riverbend Stables, LLC***, No. M2008-02698-COA-RM-CV, 2009 WL 275767, at \*3 (Tenn. Ct. App. Feb. 5, 2009) ("The application of the [***Olson***] criteria, however, is to be limited to situations involving a contract with a professional person, rather than a tradesman." (internal quotation marks omitted)); ***Henderson v. Quest Expeditions, Inc.***, 174 S.W.3d 730, 733 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Oct. 24, 2005) ("This case is factually different from ***Olson*** . . . because the white-water rafting service offered by defendant is not a 'professional' trade, which affects the public interest."); ***Carey v. Merrit***, 148 S.W.3d 912, 916 (Tenn. Ct. App. 2004), *perm. app. denied* (Tenn. Oct. 11, 2004) ("In general, application of factors used to determine if exculpatory clause violates public policy is limited to circumstances involving a contract with a professional, as opposed to a 'tradesmen in the marketplace.'"); ***Russell v. Bray***, 116 S.W.3d 1, 6 (Tenn. Ct. App. 2003), *perm. app. denied* (Tenn. Sept. 2, 2003) ("Application of the ***Olson*** criteria should be limited to situations involving a contract with a professional person, rather than a tradesman."); ***Lane-Detman, LLC v. Miller & Martin***, 82 S.W.3d 284, 292 (Tenn. Ct. App. 2002) ("Tennessee courts have found that contracting parties may not agree to release one party from liability for professional medical negligence through an exculpatory clause."); ***Floyd v. Club Sys. of Tennessee***, No. 01-A-01-9807-CV-00399 , 1999 WL 820610, at \*2 (Tenn. Ct. App. 1999), *perm. app. denied* (Tenn. Feb. 14, 2000) ("One of the exceptions to this general rule favoring the freedom to contract involves the situation where a professional person operating in an area of public interest and pursuing a profession subject to licensure by the state attempts to contract against his own negligence."); ***Hancock v. U-Haul Co. of Tenn.***, No. 01-A-01-9801-CC-00001, 1998 WL 850518, \*3 (Tenn. Ct. App. Dec. 10, 1998) ("A doctor or other licensed practitioner cannot contract for immunity from the consequences of professional negligence."); ***Petty v. Privette***, 818 S.W.2d, 743, 745 (Tenn. Ct. App. 1989) ("Because the will at issue purports to protect a professional, i.e., an attorney, we must first consider the criteria set out by ***Olson***."); ***Parton v. Mark Pirtle Oldsmobile-Cadillac-Isuzu, Inc.***, 730 S.W. 2d 634, 636 (Tenn. Ct. App. 1987), *perm. app. denied* (Tenn. May 4, 1987) ("[O]ur Supreme Court has recognized an exception where the party seeking the protection of the exculpatory provision is a professional person rendering a service of great importance to the public."); ***Teles v. Big Rock Stables, LP***, 419 F.Supp.2d 1003, 1008 (E.D. Tenn. 2006) (holding that horse stables and equine services are governed by the general rule of assumption of the risk and do not fall under the ***Olson*** exceptions."). In ***Russell v. Bray***, this Court distinguished "professionals," who sell their "expert analysis and opinion," and tradespersons, who "perform hands-on tasks." ***Russell***, 116 S.W.3d 1.

Mr. Copeland first contends that the trial court erred because its order, granting Appellee's motion for summary judgment, does not apply (or even mention) the ***Olson*** factors. While we concede that the trial court does not specifically reference ***Olson***, a

close reading of its ruling, including the oral ruling that was incorporated, by reference, into the final order, clearly indicates that the trial court declined to apply *Olson* based on its initial finding that the transportation services provided by MedicOne were not professional services, i.e., medical services. Specifically, the trial court found that the Agreement "wasn't [for] professional service. This was a transportation service." James Holmes, the driver of the MedicOne wheelchair van used to transport Mr. Copeland to his doctor's appointment, stated, in his deposition, that he was not trained as a medical professional, that he was not authorized to offer any medical assistance, and that he was simply the driver with no qualification other than a valid driver's license. In his brief, Mr. Copeland states that "the driver or 'Technician' is operating the van, picking up medical patients and transporting them to medical appointments, as his way of making a living. He very much seems to be a professional driver or attendant." While we concede that Mr. Holmes made his living driving the MedicOne wheelchair van, this fact (pursuant to the foregoing case authority) does not, *ipso facto*, mean that he is a professional so as to trigger application of the *Olson* criteria. From the language employed by the *Olson* Court, a professional is one who "operat[es] in an area of public interest," "pursu[es] a profession subject to licensure by the state," "holds [himself or herself] out as [an] expert[]," and engages in a "practice [that] is regulated by the state." This is a very narrow definition of "professional," and the foregoing cases demonstrate that the definition set out in *Olson* has not been significantly expanded since the *Olson* case was decided. The services provided by MedicOne and Mr. Holmes simply do not fall within the narrow definition of professional services set out in *Olson* and its progeny. The documents that Mr. Copeland signed, *supra*, clearly state that the services provided were limited to transportation and that no medical care would be provided by the driver.[1] In fact, Mr. Copeland has alleged no medical necessity requiring transportation by wheelchair van. Mr. Holmes had no professional training other than that required to operate the wheelchair lift, locate and secure the seatbelts, and drive the van.

Nonetheless, Mr. Copeland argues that the Tennessee Supreme Court, in *Crawford v. Buckner*, 839 S.W.2d 754 (Tenn. 1992), "expressly overruled" the rule that "the *Olson* standard was limited to professional service contracts." In *Crawford*, a resident of a Tennessee county that is not covered by the Uniform Residential Landlord and Tenant Act ("URLTA") sued her landlord for damages caused by an apartment fire. Because the URLTA contained a provision barring exculpatory clauses in rental agreements covered by its scope, the plaintiff argued that the URLTA's limited

---

[1] Mr. Copeland also argues that MedicOne's wheelchair van services are regulated under the Tennessee Emergency Medical Services Act, Tenn. Code Ann. §§ 68-140-301, *et seq*. ("TEMSA"). Mr. Copeland's argument is misplaced as the TEMSA clearly states that it "applies to each person providing emergency medical services within the state." Tenn. Code Ann. § 68-140-316. It is undisputed that the van used to transfer Mr. Copeland was not an ambulance. Also, there is no dispute that Appellant was being transferred for a non-emergent follow-up appointment. Both the Agreement and the Run Report make it clear that no medical services will be provided to Mr. Copeland. Based on these undisputed facts, we conclude that the TEMSA is not applicable in this case.

applicability denied her equal protection of the laws. The landlord defended that the plaintiff had signed an exculpatory agreement. In analyzing whether the exculpatory agreement was enforceable, the *Crawford* Court discussed this Court's opinion in *Schratter v. Development Enterprises, Inc.*, 584 S.W.2d 459 (Tenn. Ct. App. 1979), stating:

> In the most recent case to consider an exculpatory clause, the Court of Appeals, in *Schratter v. Development Enterprises, Inc.*, 584 S.W.2d 459 (Tenn. App.1979), upheld the enforceability of an exculpatory clause in a residential lease under very similar facts to this case. There, a landlord was released by the clause from his agent's negligence which caused a fire in an apartment building, resulting in damage to a tenant. The intermediate court observed, however, that in *Olson* we had adopted a test to determine whether an exculpatory provision affects the public interest, and that several of the enumerated characteristics in the test were present in that case. The court also recognized that many states have, by legislative enactment or judicial decision, limited or prohibited broad exculpatory clauses in residential leases. *Id.*, 584 S.W.2d at 461. Despite the finding that some of the public interest criteria were present, the intermediate court in *Schratter* felt constrained to hold that the exculpatory provision in the tenant's lease barred his recovery, **because of their belief that this Court had limited the *Olson* standard to professional service contracts**. *Schratter*, 584 S.W.2d at 461.

*Crawford*, 584 S.W.2d at 757 (emphasis added). Relying on the emphasized language, Appellant contends that the Tennessee Supreme Court "expressly overturned" the "professional service" requirement for applicability of *Olson*. We disagree. We do not read the *Crawford* opinion to overturn or negate the professional service criterion discussed in *Olson*; rather, the *Crawford* Court merely recognized that, even in the absence of professional services, if the exculpatory agreement contemplates matters of great necessity or public policy, a reviewing court may apply the *Olson* factors. In other words, the absence of a professional service contract will not, *ipso facto*, negate application of *Olson*. The *Crawford* Court ultimately declined to enforce the exculpatory agreement, finding that: (1) "a residential lease concerns a business of a type that is generally thought suitable for public regulation;" (2) "a residential landlord is engaged in performing a service of great importance to the public . . . which is often a matter of practical necessity for some members of the public;" (3) "as a result of the essential nature of the service and the economic setting of the transaction, a residential landlord has a decisive advantage in bargaining strength against any member of the public who seeks its services;" (4) "due to its superior bargaining position, a residential landlord confronts the public with a standardized adhesion contract of exculpation;" (5) "by definition a residential lease places the person and the property of the tenant under the control of the landlord, subject to the risk of carelessness by the landlord and his agents."

- 8 -

*Crawford*, 584 S.W.2d at 757-58. The same is not true in the instant case.

Here, the trial court specifically held that "the Wheelchair Van Agreement at issue in this cause is not an adhesion contract,[2] especially in light of the fact that the exculpatory language . . . excludes gross negligence and misconduct on the part of the defendant . . . ." In its oral ruling, the trial court explained that "[n]othing in the record . . . supports [a finding] that Mr. Copeland believed he had no option other than to sign the contract or take this particular method of transportation." Regardless, Mr. Copeland cites this Court's opinion in *Wofford v. M.J. Edwards & Sons Funeral Home, Inc.*, 490 S.W.3d 800 (Tenn. Ct. App. 2015), *perm. app.* denied (Tenn. May 6, 2016), for the proposition that, had he refused to sign the Agreement and been denied transportation services, choosing another provider would have caused delay resulting in a "difficult choice." *Id.* at 814 (citing *Buraczynski*, 919 S.W.2d at 320). The *Wofford* plaintiff was asked to sign an arbitration contract in the middle of planning her father's funeral. At the time she was asked to sign the agreement, the funeral home had taken possession of her father's body and was preparing for the funeral. In concluding that the arbitration agreement was one of adhesion, this Court reasoned that, "[t]o ask Ms. Wofford to refuse to go forward with the funeral services with Edwards at this point [was] akin to asking her to 'swap horses in midstream.'" *Id*. at 816 (footnote omitted). Relying on *Buracynski*, the *Wofford* Court reasoned:

> Edwards asserts that Ms. Wofford has failed to show that she could not have obtained the desired services from another funeral home. To support this argument, Edwards points out the multiple funeral homes named as defendants in this case, none of which required their customers to sign arbitration agreements. Additionally, the record shows that Ms. Wofford was aware of other funeral homes where she could have obtained the desired services.
>
> From our reading, however, the analysis in *Buraczynski* rests on one critical finding—that the relationship between doctor and patient is unique

---

[2] As explained by the Tennessee Supreme Court in *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996):

> An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a "take it or leave it" basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." Black's Law Dictionary 40 (6th ed. 1990); *Broemmer* [*v. Abortion Services of Phoenix, Ltd.*,] 840 P.2d [1013,] at 1015 [(Ariz. 1992)]. Professor Henderson has observed that "the essence of an adhesion contract is that bargaining positions and leverage enable one party 'to select and control risks assumed under the contract.'" 58 Va.L.Rev. at 988. Courts generally agree that "[t]he distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms." *Broemmer*, 840 P.2d at 1016. . .

and built on trust. *See* ***Buraczynski***, 919 S.W.2d at 319-320. Indeed, other Courts have come to similar conclusions. *See* ***Skelton v. Freese Const. Co.***, No. M2012-01935-COA-R3-CV, 2013 WL 6506937, at *8 (Tenn. Ct. App. Dec. 9, 2013) (noting that ***Buraczynski*** involved "the physician-patient trust relationship"); ***Pyburn v. Bill Heard Chevrolet***, 63 S.W.3d 351, 360 (Tenn. Ct. App. 2001) (noting that deciding factor in ***Buraczynski*** was the "peculiar relationship between the parties"). Because of this unique relationship and the exigency in which the services may be needed, the ***Buraczynski*** Court found that it would be problematic for the patient to terminate the relationship and seek another medical professional to perform the desired services.

   Based upon our reading of ***Buraczynski***, we also conclude that Ms. Wofford, like the patient in ***Buraczynski***, would have been faced with a difficult decision had she decided to terminate the relationship with Edwards. . . . [T]he procurement of funeral services is an emotional decision that is unfamiliar to most people. Indeed, the legislative history behind the federal regulations governing funeral services recognizes that "[a]rranging a funeral plainly involves emotional, religious, and other important social considerations" and, like in ***Buraczynski***, is a "unique" situation. Trade Regulation Rule; Funeral Industry Practices, 47 FR 42260-01.

***Wofford***, 490 S.W.3d at 815-816. No such "trust relationship," "emotional decision," or "important social consideration" exist in the instant case. Again, the Agreement Mr. Copeland signed was strictly for non-emergent transportation services. There was no preexisting relationship of trust between Mr. Copeland and Appellee; Mr. Holmes was simply the driver who was available at the time Mr. Copeland needed transportation. Furthermore, there is no evidence that, had Mr. Copeland refused to sign the Agreement, his decision would have caused any crisis. He could simply have called for other transportation (e.g., taxi or Uber), or he could have rescheduled his appointment. The scenario Mr. Copeland faced is simply not akin to the "difficult decision" contemplated by the plaintiff in ***Wofford***.

   Mr. Copeland raises several other issues, including an argument that the Agreement was a "three-party contract" between Appellant, MedicOne, and HealthSouth. As pointed out in Appellee's brief, in urging this "three-party contract" argument, Mr. Copeland attempts to "blur the lines between MedicOne and HealthSouth so as to make MedicOne an arm of the hospital and a provider of medical care" and asserts that "he had no choice in his transportation to his doctor's appointment because HealthSouth 'set up and arranged' MedicOne's wheelchair van." As discussed in detail above, there is no proof that Mr. Copeland was receiving medical services, and there is no proof that the MedicOne vehicle was the only means of transportation available to Mr. Copeland. Regardless, from our review of the record, Mr. Copeland did not raise the "three-party

contract" argument in the trial court. It is well settled that issues not raised in the trial court cannot be raised for the first time on appeal. ***Simpson v. Frontier Cnty. Credit Union***, 810 S.W.2d 147, 153 (Tenn. 1991). Arguments not asserted at trial are deemed waived on appeal. ***Devorak v. Patterson***, 907 S.W.2d 815, 818 (Tenn. Ct. App. 1995). Mr. Copeland also raises several other arguments for the first time on appeal. These arguments include the alleged regulation of Appellee by: (1) Medicare/Medicaid; (2) Patient Referral Act (a/k/a Stark Law); (3) Health Insurance Portability and Accountability Act of 1996; (4) Federal health Information Technology for Economic and Clinical Health Act; (5) Federal Social Security Act; and (6) Tennessee motor vehicle statutes. Because none of these arguments were raised in the trial court, we consider them waived on appeal. Any remaining issues are expressly pretermitted in view of our holdings herein.

## V. Conclusion

For the foregoing reasons, we affirm the order of the trial court. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Frederick Copeland and his surety, for all of which execution may enter if necessary.

_____
KENNY ARMSTRONG, JUDGE